UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | |
|---|---|
| TAMARA G. REED, | : Case No. 3:19-cv-186 |
| Plaintiff, | : |
| vs. | : Magistrate Judge Sharon L. Ovington |
| | : (by full consent of the parties) |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : |
| Defendant. | : |

## DECISION AND ENTRY

**I.     Introduction**

In June 2014, Plaintiff Tamara G. Reed filed an application for Disability Insurance Benefits and for a period of disability benefits.  The claim was denied initially and upon reconsideration.  After a hearing at Plaintiff's request, Administrative Law Judge Eric Anschuetz concluded Plaintiff was not eligible for benefits because she was not under a "disability" as defined in the Social Security Act.  The Appeals Council denied Plaintiff's request for review, and Plaintiff then filed an action before this Court. At the parties' request, this Court granted a Joint Motion to Remand to the Commissioner.

On remand, Plaintiff's claim was assigned to Administrative Law Judge Deborah F. Sanders.  After a hearing, the Administrative Law Judge concluded Plaintiff was not eligible for benefits because she was not under a "disability" as defined in the Social Security Act.  Plaintiff subsequently filed this action, and now seeks a remand for benefits,

or in the alternative, for further proceedings. The Commissioner asks the Court to affirm the non-disability decision.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. No. 9), the Commissioner's Memorandum in Opposition (Doc. No. 14), Plaintiff's Reply (Doc. No. 16), and the administrative record (Doc. No. 8).

## II. Background

Plaintiff asserts that she has been under a disability since February 28, 2005. Plaintiff originally alleged disability beginning August 1, 2001, but amended her alleged onset date. On her date last insured, Plaintiff was fifty-three years old. At that time, she was considered a "person closely approaching advanced age" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(d). However, Plaintiff now has advanced to the next age category, so she currently is considered a "person of advanced age." *See* 20 C.F.R. § 404.1563(e). She has at least a high school education.

The evidence of the record is sufficiently summarized in the ALJ's decision (Doc. No. 8-8, Page ID 564-577), Plaintiff's Statement of Errors (Doc. No. 9), the Commissioner's Memorandum in Opposition (Doc. No. 14), and Plaintiff's Reply (Doc. No. 16). Rather than repeat these summaries, the Court will focus on the pertinent evidence in the discussion below.

## III. Standard of Review

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470, 106 S. Ct. 2022, 90 L. Ed. 2d 462 (1986); *see* 42

U.S.C. § 423(a)(1). The term "disability" – as defined by the Social Security act – has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §423 (d)(1)(A); *see Bowen*, 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakely*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …" *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry -- reviewing the correctness of the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651

3

(6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**IV.**     **The ALJ's Decision**

As noted previously, the Administrative Law Judge was tasked with evaluating the evidence related to Plaintiff's application for benefits. In doing so, the Administrative Law Judge considered each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. She reached the following main conclusions:

Step 1: Plaintiff did not engage in substantial gainful employment from February 28, 2005 through December 31, 2011.

Step 2: She has the severe impairments of depressive disorder, pain disorder with psychological and medical features, obesity and lumbar degenerative disc disease with history of microlumbar hemilaminectomy and discectomy.

Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work," and "she could push/pull and lift/carry up to 20 pounds occasionally and 10 pounds frequently, and could occasionally climb ramps and stairs, never ladders, ropes or scaffolds, occasionally balance, stoop, kneel, crouch and crawl, perform 1 to 4 step tasks, occasional interaction with coworkers, no tandem or shared tasks, occasional interaction with supervisors[,] no over the shoulder supervision, no interaction with the public in a customer service capacity."

> Step 4: Plaintiff was unable to perform any past relevant work.
>
> Step 5: Plaintiff could perform a significant number of jobs that exist in the national economy.

(Doc. No. 8-8, PageID 567-76). Based on these findings, the Administrative Law Judge concluded that Plaintiff was not under a benefits-qualifying disability. *Id.* at 576.

## V. Discussion

### a. Vocational Expert's Testimony

In her first assignment of error, Plaintiff argues the ALJ erroneously relied on the vocational expert's testimony in finding at Step Five that Plaintiff could perform work that existed in significant numbers in the national economy. (Doc. No. 9, PageID 1004).

This argument relates to Plaintiff's limitations of "no over-the-shoulder supervision" and "no tandem or shared tasks" that are delineated in Plaintiff's residual functional capacity. (Doc No. 8-8, PageID 608). In response to a hypothetical that included these limitations, the vocational expert testified that while past work would be eliminated, there would be some light, unskilled work that the individual would be able to perform. *Id.* at 609. Plaintiff's counsel then posed several follow-up questions:

> Q: Returning to the Judge's hypothetical, is it safe to assume that even at the types of unskilled jobs that we're talking about today that there would be some sort of training or probationary period?
>
> A: There usually is. Yes.
>
> Q: During that training or probationary period, is it safe to assume that there would be some degree of over-the-shoulder supervision and/or performance of tandem tasks while the worker learned the job?
>
> A: Depending on the job, I would say that's possible. Yes.

5

> Q: If our hypothetical worker could not withstand any over-the-shoulder supervision or tandem tasks whatsoever, in your opinion, would they be able to weather the probationary period or the training period at these types of jobs?
>
> A: That's hard to say. It may be difficult. Some of those jobs – like if they take a job as a folder, you know, once the job is demonstrated, the person should be able to learn how to fold items. So I don't think that would be an obstacle for that particular job. As a cleaner, I believe it would and possibly an inspector.
>
> Q: Would it be safe to assume that even in that folding job that the demonstration itself would involve at least some degree of over-the-shoulder supervision or be a tandem task?
>
> A: I guess, you know, that term over-the-shoulder, I'm not sure, I never understood what that means. Does that mean literally the supervisor is standing behind the worker and looking over the worker's shoulder?
>
> Q: I would assume so or I would perhaps expand it to standing right next to them or across the table from them watching them do work.
>
> A: Well, I would assume that there would be sometimes during a training period where that would occur. Yes.

(Doc. No. 8-8, PageID 610-11).

There are several reasons that Plaintiff finds the ALJ's decision at Step Five to be problematic. For one, in relying on the testimony of the vocational expert, the ALJ found Plaintiff would be able to perform the requirements of specific occupations such as housekeeping cleaner, folder, and inspector. (Doc. No. 8-8, PageID 576). Yet, as the aforementioned exchange indicates, Plaintiff's ability to perform these jobs was brought into question by the vocational expert's own testimony.

First and foremost, the vocational expert specifically admitted: "I guess, you know, that term over-the-shoulder, I'm not sure, I never understood what that means." (Doc. No.

6

8-8, PageID 610-11). This statement suggests that he did not understand what the limitation meant in the context of the ALJ's hypothetical or in the context of counsel's questioning. Notably absent from the ALJ's decision is any mention of this uncertainty.

During the exchange with Plaintiff's counsel, the vocational expert testified there would be some level of "over-the-shoulder supervision" and/or "tandem tasks" during the probational or training period for at least two jobs. (Doc. No. 8-8, PageID 610). He testified that if the individual would not be able to withstand any "over-the-shoulder supervision" or "tandem tasks," such limitations would be an obstacle for the housekeeping cleaner job and also "possibly" for the inspector job. *Id.* This essentially walked back the vocational expert's previous testimony in regard to the ALJ's hypothetical that an individual like Plaintiff would be able to perform these jobs.

As to the folder job, the vocational expert testified that once the job is demonstrated, the individual should be able to perform that job without interference from the limitations. (Doc. No. 8-8, PageID 610). Upon further questioning from Plaintiff's counsel, however, the vocational expert admitted to not understanding the phrase "over-the-shoulder supervision," and asked for clarification. Then, after Plaintiff's counsel provided a definition, the vocational expert indicated that he "would assume that there would be sometimes during a training period where that would occur." *Id.* at 610-11.

In response to Plaintiff's arguments, the Commissioner alleges Plaintiff's counsel "expanded the definition of 'over-the-shoulder' to 'perhaps' mean 'standing right next to them or across the table from them watching them do the work." (Doc No. 14, PageID 1031). Regardless, the vocational expert provided his testimony as to the housekeeping

7

cleaner and inspector jobs *before* Plaintiff's counsel offered a definition for the limitation. (Doc. No. 8-8, PageID 611). It is reasonable to assume the vocational expert was basing that testimony on the same knowledge that he used in answering the ALJ's hypothetical.

The undersigned also is not convinced the definition posed by Plaintiff's counsel inaccurately or inappropriately "expanded" the limitation beyond the common-sense meaning. At the very least, Plaintiff's categorization that "over-the-shoulder" also would include supervision when a supervisor is standing "right next to" the individual seems entirely reasonable and to be an accurate portrayal of the limitation. Likewise, standing "across the table" also seems reasonable. A table may add slight distance, but the general premise of close supervision remains the same. It also seems relevant that Plaintiff's counsel offered the definition only after the vocational expert admitted to having never understood what "over-the-shoulder supervision" meant and specifically asked if it literally meant "the supervisor is standing behind the worker and looking over the worker's shoulder." (Doc. No. 8-8, PageID 611). Had the vocational expert understood the meaning and not expressly admitted otherwise, Plaintiff's counsel would not have needed to provide a definition, nor would the vocational expert have needed to request one and rely upon it.

In addition, the Commissioner appears to argue that some level of "over-the-shoulder supervision" and/or "tandem tasks" during only the training period or demonstration period would not render these jobs wholly unsuitable for Plaintiff. This may be accurate as to the folder job, as demonstration of that job likely may be short in duration. Yet, this argument is not persuasive as to the other jobs. Naturally, if Plaintiff's limitation would be an obstacle to the housekeeping cleaner job and inspector job during the training

8

period, it seems entirely possible that Plaintiff would be unable to successfully complete the necessary training and retain that employment. Additionally, as the vocational expert did not provide any testimony as to the duration of these training periods, it would be imprudent to assume that such training would be so short as to entirely disregard the vocational expert's unfavorable testimony as to Plaintiff's ability to perform these jobs.

Nevertheless, even assuming that the folder job would not be eliminated, the Commissioner's remaining argument still fails. In an attempt to minimize the issues present in the vocational expert's testimony as to the other jobs, the Commissioner argues that even if the folder job were the only job, there still would be a significant number of jobs available, as the vocational expert identified 50,000 jobs as a folder in the national economy. (Doc. No. 14, PageID 1031-32). This argument overlooks the fact that "[o]ne of the criteria used to determine whether a significant number of jobs meets the significant number requirement is 'the reliability of the vocational expert's testimony.'" *Wyczlinksi v. Astrue*, No. 3:09-cv-481, 2011 WL 798135, at *6 (S.D. Ohio 2011) (Black, D.J.) (citing *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)). As previously discussed, the reliability of the vocational expert's testimony was called into question here when he expressed uncertainty as to the relevant limitation and Plaintiff's ability to perform certain jobs.

Moreover, the ultimate decision did not simply rest on the 50,000 jobs available in the national economy as a folder. Rather, the ALJ's decision that there were a significant number of jobs in the economy that Plaintiff could perform also rested on the 300,000 jobs available nationally as a housekeeping cleaner and the 100,000 jobs available nationally as an inspector. *See Wyczlinksi*, 2011 WL 798135, at *6 ("Whether or not 450 jobs would

9

meet the significant number requirement in this case is not determinative, as the vocational expert's testimony is so flawed that it is of little or no value").

At this step, the burden of proof had shifted to the Commissioner, s*ee McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 836 (6th Cir. 2006), and the Commissioner was required to "make a finding 'supported by substantial evidence that [Plaintiff had] the vocational qualifications to perform specific jobs.'" *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010) (citing *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). The vocational expert's opinion was severely flawed, and in relying on that opinion, the Commissioner failed to meet this burden.

### b. **Medical Opinions**

Plaintiff also challenges the weighing of Dr. David DeMuth and Dr. Mary Ann Jones' medical opinions, and argues these opinions demonstrate that Plaintiff's severe impairments impact her ability to adequately interact with others or successfully function in the workplace on a sustained basis. (Doc. No. 9, PageID 1005-08). By implication, Plaintiff contends the ALJ's residual functional capacity assessment was insufficient and that the ALJ instead should have found her severe impairments to preclude her from work.

Drawing support from Dr. DeMuth and Dr. Jones' medical opinions, which were afforded "partial weight," the ALJ limited Plaintiff to "occasional interaction with coworkers, no tandem or shared tasks, occasional interaction with supervisors[,] no over the shoulder supervision, [and] no interaction with the public in a customer service capacity." (Doc. No. 8-8, 569, 573-74). Based on a review of the record, the undersigned finds the ALJ did not commit reversible error in weighing the related medical opinions.

Dr. DeMuth, the state agency reviewing psychiatrist, determined Plaintiff could "relate on a superficial basis to coworkers and supervisors." (Doc. No. 8-3, PageID 118). The ALJ acknowledged this opinion, and "set forth the limitation in more vocationally relevant terms," in Plaintiff's residual functional capacity. (Doc. No. 8-8, PageID 573). These terms, according to the ALJ, were "consistent with the evidence that shows Plaintiff … was found to be cooperative with providers." *Id.* at 573-74. Plaintiff argues that such a classification was erroneous because the record instead indicates that Plaintiff was not cooperative. This argument is not well-taken because substantial evidence supports the ALJ's finding that Plaintiff was usually cooperative.

Consultative examining psychologist Dr. Jones noted that Plaintiff was cooperative with her during the mental status examination. (Doc. No. 8-7, PageID 285). Likewise, providers at Huber Heights Medical Center repeatedly assessed that Plaintiff was cooperative on exam. *Id.* at 348-61, 427-80, 547-56, 907-28, 931-79. The usual provider was Plaintiff's primary physician, Dr. Teresa Menart. *Id.*

Dr. DeMuth also observed that Plaintiff would work best in small groups or alone. (Doc. No. 8-3, PageID 118). Plaintiff contends the ALJ erroneously categorized this as a description of optimal environment rather than a limitation. Regardless of its accuracy, this categorization has no lasting consequence because the ALJ accounted for this finding in the mental residual functional capacity by limiting Plaintiff to "occasional interaction with coworkers" and "no tandem or shared tasks." (Doc. No. 8-8, PageID 569). These limitations, by way of reason, limit Plaintiff to primarily solitary work.

11

In addition, Plaintiff alleges highly specific errors as to Dr. Jones' opinions. Dr. Jones found Plaintiff "would be unable to relate sufficiently to coworkers and supervisors on any sustained basis (for two or more hours at a time)." (Doc. No. 8-7, PageID 288). Still, Plaintiff "apparently [could] adequately relate to her family, and on occasion, to store clerks," and Plaintiff "related adequately during the interview process to the evaluator and to other office reception staff." *Id.* But, as noted, "increasing social withdraw" rendered her unsuitable for jobs requiring sustained public interaction. *Id.*

Plaintiff contends the ALJ erroneously excluded a "critical qualification" from Dr. Jones' report, opining that Plaintiff can adequately relate only "on occasion" to store clerks, rather than on a sustained basis. Such an exclusion does not equate to an impermissible mischaracterization or over-generalization that would give rise to reversible error. The qualifier "on occasion" appears to refer to the frequency at which Plaintiff went to the store and not the frequency at which she was able to relate to store clerks. Plaintiff could relate to store clerks only "on occasion" since she only occasionally went to the store. (Doc. No. 8-7, PageID 285). She reported to Dr. Jones that her husband and daughter primarily did the grocery shopping for their household. *Id.* Further, Plaintiff's testimony during the hearing suggests her reasoning for avoiding the store is largely attributed to her physical, and not mental, impairments. (Doc. No. 8-8, PageID 605-06).

Contrary to Plaintiff's remaining arguments, substantial evidence supports the weighing of Dr. Jones' opinion. Dr. Jones' did in fact opine that Plaintiff would be unable to relate to coworkers and supervisors on a sustained basis. *Id.* at 574. Yet Dr. Jones classified "sustained basis" as two or more hours at a time, meaning that Plaintiff would

be unable to relate to coworkers and supervisors for two or more hours at a time. *Id.* This opinion, according to the ALJ, was inconsistent with the evidence in the record, but the ALJ still limited Plaintiff to only "occasional" interaction with coworkers and supervisors. *See* S.S.R. 83-10, 1983 SSR LEXIS 30, *13, 1983 WL 31251, *5 (S.S.A. 1983) ("'Occasionally' means occurring from very little up to one-third of the time"). Similarly, Dr. Jones found jobs requiring sustained public interaction would not be appropriate given Plaintiff's social withdrawal. Accommodating this opinion, the ALJ limited Plaintiff to no interaction with the public in a customer service capacity. (Doc. No. 8-8, PageID 569).

The undersigned is certainly sympathetic to the issues arising from Plaintiff's physical and mental impairments. However, substantial evidence supports the weighing of Dr. DeMuth and Dr. Jones' opinions, and Plaintiff's ability to interact with others is fairly reflected in her residual functional capacity. No error was committed in this regard.

### c. Conservative Treatment as Adverse Factor

Plaintiff also argues that the ALJ failed to appreciate the seriousness of Plaintiff's treatment for her severe impairments, and criticizes the ALJ's reference to such treatment as "conservative." (Doc. No. 9, PageID 1009). In support of this assertion, Plaintiff cites to this Court's previous acknowledgement that "[t]he phrase 'relatively conservative' without further explanation – which the ALJ did not provide – is a euphemism for 'not serious.'" *Schleiger v. Comm'r of Soc. Sec.*, No. 3:18-CV-16, 2019 WL 1915206, at *5 (S.D. Ohio April 30, 2019) (Ovington, M.J.), Report & Recommendation, adopted in part and rejected in part, 2019 WL 4744807 (S.D. Ohio Sept. 30, 2019) (Rice, D.J.).

13

At several points in the decision, Plaintiff's treatment is referred to as "conservative." There is no dispute, however, that Plaintiff's severe impairments were in fact serious. Plaintiff underwent a micro-lumbar hemi-laminectomy and discectomy, and due to continued pain post-surgery, Plaintiff consulted with multiple specialists and was treated for pain with steroid injection and medications. *Id.* at 1009. Plaintiff's mental impairments also were serious, and were recognized as such by the ALJ.

In this case, unlike *Schleiger,* the ALJ does provide some explanation for the use of the term "conservative" to describe both Plaintiff's physical and mental impairments. For example, the ALJ does not necessarily describe Plaintiff's surgery as conservative, as Plaintiff suggests. Rather, the ALJ appears to refer to the post-surgery treatment as conservative in stating that Plaintiff "had lumbar surgery, but records up through her date last insured for disability show limited and conservative treatment with medication and minimal abnormal findings on examinations." (Doc. No. 8-8, PageID 571). The ALJ further notes that Plaintiff described her pain as "intermittent" and that the description was "consistent with the level of conservative treatment she received for pain." *Id.* at 571-72.

It should be noted that while Plaintiff does not explicitly contest the ALJ's classification of her mental health treatment as "conservative," the ALJ also explains the use of this term in regard to her mental health treatment. For instance, the ALJ recognizes that Plaintiff was treated with medication, but notes that Plaintiff did not attend counseling and that there was no evidence of inpatient treatment. *Id.* at 572. The ALJ also cites to treatment notes from Plaintiff's primary physician that recognized her mental health. *Id.* The notes reflected mostly normal findings as characterized by the ALJ. *Id.*

14

Therefore, the ALJ's decision to refer to Plaintiff's treatment as "conservative" does not so undermine the seriousness of her impairments as to render the ALJ's decision not supported by substantial evidence based on this point alone.

## VI. Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99, 111 S. Ct. 2157, 115 L. Ed. 2d 78 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming, and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for Disability Insurance Benefits should be granted.

## IT IS THEREFORE ORDERED THAT:

1. The ALJ's non-disability decision is vacated;

2. No finding is made as to whether Plaintiff Tamara G. Reed was under a "disability" within the meaning of the Social Security Act;

3. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this decision; and

4. The case is terminated on the Court's docket.

March 11, 2021                                      *s/Sharon L. Ovington*
                                                                        Sharon L. Ovington
                                                                        United States Magistrate Judge